IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE LINERBOARD ANTITRUST LITIGATION | : : : | |
| THIS DOCUMENT RELATES TO: | : : | MDL No. 1261 |
| Civil Action Numbers 98-5055 and 99-1341 | : : : | |

**ORDER & MEMORANDUM**

**O R D E R**

**AND NOW**, this 3rd day of October, 2008, upon consideration of the Final Report on Claims Administration dated June 15, 2006, supplemented by letter/report from the Claims Administrator dated July 22, 2008[1] and the recommendations of liaison counsel for the class, and for the reasons set forth in the attached Memorandum, **IT IS ORDERED** as follows:

1. The Final Report on Claims Administration dated June 15, 2006, as supplemented by a letter/report dated July 22, 2008, is **APPROVED**;

2. Within thirty (30) days following entry of this Order, the Claims Administrator shall **MAKE** a cy pres distribution of the balance remaining in the class settlement fund, $126,832.82 to the Philadelphia Bar Foundation without any direction as to allocation;

3. The Court having found that the Claims Administrator has taken all practicable steps to assure that all checks issued to claimants were cashed, any check not already cashed shall not be recognized and the claim of such person shall be extinguished;

---

[1] A copy of the supplemental letter/report of the Claims Administrator dated July 22, 2008, shall be docketed by the Deputy Clerk.

4.  After a minimum of three (3) years following entry of this Order, the Claims Administrator may destroy all claim forms, related correspondence, and administrative records, including a copy of the list(s) of all claims submitted and the computer database used to create the lists of claimants and their distribution amounts;

5.  The Claims Administrator, class plaintiffs, class plaintiffs' counsel and all other persons involved in the review, verification, calculation, tabulation or any other aspect of the processing of the proof of claim forms submitted in connection with settlement of claims of the plaintiff classes are released and discharged from any and all claims arising out of such involvement, and all class members, whether or not they received payment from the settlement fund, are barred from making further claims against the Net Settlement Fund or the discharged and released persons; and

6.  The Court retains continuing jurisdiction over the four settlement agreements – approved by Orders dated August 26, 2003, December 8, 2003, and April 21, 2004 – in this matter.

## **M E M O R A N D U M**

Presently before the Court is the Final Report on Claims Administration submitted by class counsel.  Liaison counsel for the class recommended that the $126,832.82 remaining in the class fund be distributed as a <u>cy pres</u> fund to the Philadelphia Bar Foundation and the Camden Center for Law and Social Justice.[2]  For the reasons set forth below, the Court directs that the

---

[2] By letter dated July 11, 2006, liaison counsel for the class recommended that $10,000 be given to the Camden Center for Law and Social Justice and that the remainder of the residual fund be given to the Philadelphia Bar Foundation, with $50,000 allocated to Community Legal Services of Philadelphia ("CLS") and $25,000 allocated to the Public Interest Law Center of Philadelphia ("PILCOP").

remaining funds be distributed as a cy pres fund to the Philadelphia Bar Foundation without any direction as to allocation.

I.   BACKGROUND

   A.   The Class Action

This antitrust case began as a class action involving allegations that a number of U.S. manufacturers of linerboard[3] engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The seven lawsuits transferred to this Court for all pretrial proceedings by the Judicial Panel on Multidistrict Litigation on February 12, 1999 were instituted after an administrative complaint filed by the Federal Trade Commission ("FTC") against Stone Container Corporation was resolved by a consent decree. See In re Linerboard Antitrust Litig., 2000 WL 1475559, at *1 (E.D. Pa. Oct. 4, 2001) (setting forth allegations in FTC complaint and details of consent decree). Class plaintiffs named the following defendants in their Complaints and Amended Complaints – Stone Container Corporation, Jefferson Smurfit Corporation, Smurfit-Stone Container Corp., International Paper Company, Georgia-Pacific Corporation, Temple-Inland, Inc., Gaylord Container Corporation, Tenneco, Inc., Tenneco Packaging, Inc.,

---

By letter dated July 25, 2008, liaison counsel for the class also asked the Court to consider not making a cy pres distribution because of ongoing expenses involved in litigation against liaison counsel arising out of the allocation of counsel fee in the case. The Court declines to do so.

[3] Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard; corrugated sheets are also referred to as containerboard. The defendants named in the instant lawsuits are major integrated manufacturers and sellers of linerboard, corrugated sheets, and corrugated boxes.

Union Camp Corporation, Packing Corporation of American and Weyerhaeuser Paper Company – and alleged that they conspired to raise the price of corrugated containers and corrugated sheets throughout the United States by restricting production and/or curtailing inventories.

By Memorandum and Order dated September 4, 2001, this Court certified two classes of plaintiffs – a sheets class and a box class. In re Linerboard Antitrust Litig., 203 FRD 197, 224 (E.D. Pa. 2001).  The Court's certification ruling was affirmed by the United States Court of Appeals for the Third Circuit. In re Linerboard Antitrust Litig., 305 F3 145 (2002), cert. denied, 538 U.S. 977 (2003).  Following certification of the classes, the parties entered into extended settlement negotiations.  By Order dated August 26, 2003, this Court approved a partial settlement in the amount of $8 million between plaintiff classes and Temple-Inland, Inc. and Gaylord Container Corp.  See In re Linerboard Antitrust Litig., 292 F. Supp. 2d 631 (E.D. Pa. 2003).  The $8 million settlement was reduced to $7.2 million in accordance with the terms of the settlement agreement based on the number of parties that subsequently opted-out of the classes.  This first partial settlement was described as an "ice-breaker" – a settlement that would lead to further settlements.

Within a month of Court approval of the Temple-Inland/Gaylord settlement, the plaintiff classes and defendants International Paper Company and Union Camp Corporation, Georgia Pacific Corporation, and Weyerhaeuser Company announced they had reached a settlement agreement in the total amount of $68 million. The Court approved that settlement on December 8, 2003.  See In re Linerboard Antitrust Litig., 2003 WL 23525699 (E.D. Pa. Dec. 8, 2003).  Prior to that date, in October and November 2003, the parties announced two additional partial settlements with defendants Packaging Corporation of America, Tenneco, Inc., and Tenneco Packaging, Inc. (the "PCA settlement") in the amount of $43 million and with defendants Stone

4

Container Corporation, Jefferson Smurfit Corporation, and Smurfit Stone Container Corporation (the "Stone settlement") in the amount of $92.5 million. As a result of a "most favored nation" clause in the PCA settlement agreement, the terms of the Stone settlement triggered a reduction in the amount owed by PCA from $43 million to $34 million. Id. The Court approved both the PCA settlement and the Stone settlement in a Memorandum and Order dated April 21, 2004. See In re Linerboard Antitrust Litig., 321 F. Supp. 2d 619 (E.D. Pa. 2004). With the Court's approval of these last two partial settlements, all claims in the class action were resolved for a total of $202,572,489.

### B. The Class Fund

On February 10, 2005, the Court approved the Motion of Class Counsel for Authorization of Initial Disbursement of Funds and authorized the distribution of nearly 90% of the Net Settlement Fund. On November 2, 2005, the Court approved a second distribution to members of both classes, totaling approximately $9.4 million. In the Final Report on Claims Administration, submitted to the Court on June 15, 2006, class counsel stated that there was a residual fund of $111,109.53. Final Report on Claims Administration at 1. By supplemental letter/report to the Court dated July 22, 2008, the Claims Administrator informed the Court that the residual fund had increased to $126,832.82. Letter/report of July 22, 2008. The majority of the residual fund, $66,000, was set aside in the event of an appeal of denied claims. No appeals, however, were timely filed.[4] Final Report on Claims Administration at 1. The remainder of the

---

[4] During a telephone conference with the Claims Administrator and class counsel on January 31, 2006, class counsel reported to the Court that neither Von Hoffman Corporation nor Midwest Box Company had appealed the denial of its claims and that the time for filing a timely appeal had passed. These two claims formed the basis for the creation of the $66,000 set-aside fund.

residual fund consists of uncashed checks ($14,589.34), a tax refund ($24,388.99), and interest ($21,854.49).  Letter/report of July 22, 2008.

The question before the Court at this time relates to distribution of the residual fund.

## II.     CY PRES DISTRIBUTION

### A.     Use of Cy Pres Doctrine in Class Actions

Because it is not uncommon to have funds remaining in a class action after payment of all identifiable claims, a fairly extensive body of case law has developed on the subject of their appropriate distribution.  In re Motorsports Merchandise Antitrust Litig., 160 F. Supp. 2d 1392, 1393 (N.D. Ga. 2001).  Federal courts rely upon their broad discretionary powers to shape equitable decrees for distributing unclaimed class action funds.  Six (6) Mexican Workers v. Arizona Citrus Growers, 904 F.2d 1301, 1307 (9th Cir. 1990) (citing Van Gemert v. Boeing Co., 739 F.2d 730, 737 (2d Cir. 1984).  In general, courts have considered four options when faced with unclaimed settlement funds: cy pres distributions; pro rata distribution to class members; escheat of funds to a governmental body; and reversion to the defendant.  In re Motorsports, 160 F. Supp. 2d at 1394 (citing 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions §§ 10.13 to 10.25 (3d ed. 1992)).  In this case, class counsel has suggested a distribution pursuant to the cy pres doctrine.  Defendants agreed to that procedure.

The cy pres doctrine originated as a means to save testamentary charitable gifts that would have otherwise failed.  In re Infant Formula Multidistrict Litig., 2005 WL 2211312, at *1 (N.D. Fla. Sept. 8, 2005); see also Note, Damage Distribution in Class Actions: The Cy Pres Remedy, 39 U. Chi. L. Rev. 448 (1972).  Under cy pres, a court looks for an alternative recipient of the testator's gift that would best effectuate the testator's intent.  Id. at 452.  In recent years, the doctrine has "become more flexible" and has found increasing application in the class action

context.  Superior Beverage Co., Inc. v. Owens-Illinois, Inc., 827 F. Supp. 477, 478 (N.D. Ill. 1993).  One court has summarized its application to the class action context as follows:

> Where settlement funds remain after distribution to class members, courts have approved charitable donations to organizations geared toward "combating harms similar to those that injured the class members.  Such a donation may serve the cy pres principle of indirectly benefitting all class members."

In re Motorsports, 160 F. Supp. 2d at 1394 (quoting Jones v. National Distillers, 56 F. Supp. 2d 355, 358 (S.D.N.Y. 1999)).

In applying the cy pres doctrine to distribute remaining class funds, many courts choose charitable organizations based on consideration of whether the distribution furthers the objectives underlying the original lawsuit.  See In re Airline Ticket Comm. Antitrust Litig., 307 F.3d 678, 682-83 (8th Cir. 2002) ("the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of the class members, and the interests of those similarly situated").  Other courts, however, have expanded the cy pres doctrine to permit distributions to charitable organizations whether or not such organizations have any direct or indirect relationship to the specific law or subject matter of the litigation.  See, e.g., Superior Beverage Co., 827 F. Supp. at 478-79 (approving grants from unclaimed class settlement funds to legal aid bureau, various law school programs, museum, public television station, and other charities).

Although the "use of funds for purposes closely related to their origin is still the best cy pres application, the doctrine of cy pres and the courts' broad equitable powers now permit the use of funds for other public interest purposes by educational, charitable, and other public service organizations."  Jones, 56 F. Supp. 2d at 359 (quoting Superior Beverage Co., 827 F. Supp. at 478-79).  For example, the Court of Appeals for the Second Circuit has approved a

district court's allocation, pursuant to the cy pres doctrine, of settlement funds to those class members "'most in need of help.'"  In re Holocaust Victim Asset Litig., 424 F.3d 158, 161 n.3 (2d Cir. 2005) (quoting In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145, 158 (2d Cir. 1987)).

### B. Distribution in This Case

Liaison counsel for the class has recommended that all but $10,000 of the residual fund be distributed pursuant to the cy pres doctrine to the Philadelphia Bar Foundation (the "Bar Foundation").  The Bar Foundation is the charitable arm of the Philadelphia Bar Association.  Since 1964, it has "awarded millions of dollars in grants to law-related programs in the Philadelphia area that assist the indigent, elderly and disabled, as well as abused women and children."  Bar Foundation - Grants, http://www.philadelphiabar.org/page/Grants (last visited Oct. 2, 2008).  The Bar Foundation's mission is to promote "access to justice for all people in the community, particularly those struggling with poverty, abuse and discrimination." http://www.philadelphiabar.org/page/BarFoundation (last visited Oct. 2, 2008).

With respect to the cy pres distribution to the Bar Foundation, liaison counsel proposed that $50,000 be awarded to Community Legal Services ("CLS") of Philadelphia.  In support of this suggested distribution, liaison counsel explained:

> "This case involved price fixing of one of the most commonly distributed products in the economy – corrugated boxes – and there can be little doubt that the burdens from the artificially increased prices for boxes were passed on and ultimately fell upon the consumers purchasing the items shipped in those boxes.  It is appropriate to award the sum to an organization serving the legal needs of the poorest, upon whom any effort to tamper with the market falls most heavily."

Final Report on Claims Administration at 3.

The Court deems the rationale advanced by liaison counsel in support of a cy pres distribution to CLS persuasive with regard to a distribution to the Bar Foundation itself.  The Bar Foundation gives grants to legal services organizations, such as CLS, that are dedicated to protecting the rights of the poor and indigent in the Philadelphia area.  As the Bar Foundation itself explains, "[g]iven the Foundation's quest to provide equal justice for all, as well as its ability to gauge and respond to local needs by funding beneficial projects . . . the Foundation can put unclaimed funds to good use."  Bar Foundation Legal Memorandum, available at http://www.philadelphiabar.org/page/BarFoundationLegalMemorandum (last visited Oct. 2, 2008).  The Court agrees and deems the Bar Foundation an appropriate and most deserving recipient of the remaining funds.

CLS is certainly a well respected legal services organization in the Philadelphia area, and would be a worthy recipient of any cy pres funds.  Nevertheless, the Court rejects class counsel's recommendation that the Bar Foundation be directed to award $50,000 of the cy pres distribution to CLS.  Instead, the Court leaves that decision to the Bar Foundation.  In doing so, the Court notes that this Order and Memorandum does not preclude the Bar Foundation from awarding all or part of its cy pres distribution to CLS.

The Court next addresses the recommendation of liaison counsel for the class that $25,000 of the cy pres distribution to the Bar Foundation be allocated to the Public Interest Law Center of Philadelphia ("PILCOP").  In making that recommendation, class counsel stated that PILCOP works to secure systemic reforms through impact litigation.  The Court agrees that PILCOP is a well respected public legal services organization in the Philadelphia area and, in general, is a deserving recipient of cy pres funds.  However, because an attorney formerly associated with this case currently serves in a lead role at PILCOP, the Court does not deem it

appropriate to direct any of the cy pres distribution to PILCOP, and takes no position on whether the Bar Foundation should do so.

Lastly, liaison counsel for the class recommended that $10,000 of the cy pres fund be awarded to the Camden Center for Law and Social Justice ("the Center"). With respect to this recommendation, by letter dated July 11, 2006, he advised the Court that one of his former partners, John Grogan, Esquire, founded the Center. Under those circumstances, the Court does not deem it appropriate to direct any of the cy pres distribution to the Center, and takes no position on whether the Bar Foundation should do so.

### III. CONCLUSION

For all of the foregoing reasons, the Court concludes that a cy pres distribution of the $126,832.82, plus accrued interest since July 22, 2008, remaining in the class settlement fund to the Philadelphia Bar Foundation furthers the underlying litigation goals of this case and approves such a distribution without any specific allocation.

BY THE COURT:

/s/ Honorable Jan E. DuBois
JAN E. DUBOIS, J.